## Supreme Court—Appellate Division—Third Department.

### March, 1905.

## THE PEOPLE v. CAREY GREEN.

### (103 App. Div. 79.)

1. RAPE—CORROBORATIVE EVIDENCE—PENAL CODE, SEC. 283.

>The corroborating testimony required by section 283, Penal Code, to sustain convictions for abduction, compulsory marriage, rape or defilement upon the testimony of the female abducted, compelled or defiled, must extend to every material fact which is essential to constitute the crime, and where all the evidence the prosecution claims to have presented in corroboration of complainant's evidence is that she was with defendant at the times stated, that two days after the assault she told her parents, and that a calico waist she wore was torn in the struggle, it is not sufficient to sustain a conviction of rape in the first degree.

APPEAL by the defendant, Carey Green, from a judgment of the County Court of Otsego county in favor of the defendant, bearing date the 31st day of December, 1903, and entered in the office of the clerk of the county of Otsego, upon the verdict of a jury convicting the defendant of the crime of rape in the first degree.

Edson A. Hayward and Gibbs, Wilbur & Gibbs, for the appellant.

Merritt Bridges, for the respondent.

CHASE, J.: The defendant at the time of the alleged crime was about thirty-seven years old; a married man living with his wife on a farm several miles from another farm on which the complainant resided with her parents. The complainant at the time of the alleged crime was about twenty-four years old. She is a cousin of the defendant's wife. Complainant had taught school two terms, and the defendant's wife is a school teacher, and at the time of the alleged crime was employed as the teacher of a school about three miles from where she lived with the defendant, and she was accustomed to go from her home to and from her school each school day.

About a week before the 1st of October, 1902, complainant received a letter from defendant's wife inviting her to visit at the defendant's and attend a fair. Complainant accepted the invitation and on September thirtieth went to the defendant's, arriving there about five o'clock in the afternoon. Defendant was at his house alone, but his wife came from her school in about ten minutes thereafter. Complainant remained there all night, sleeping in their parlor bed room. During the evening defendant's wife said that the weather was so bad that she had not told her scholars that she was going to the fair.

In the morning she said she was going to her school and she also said to complainant that she could go to the fair with him (her husband). Complainant says that she replied that she "had rather go to school," but defendant's wife said: "It would be a nice day and we might better go to the fair." Defendant's wife left for her school at eight o'clock in the morning. Defendant's house faces the west and it is about forty-five feet from the road.

The front door opens into the living and dining room which is in the northwest corner of the house. The parlor opens from the living and dining room and it is in the southwest corner of the house. The parlor bedroom is east of the parlor and opens from it. The kitchen is east from the living and dining room and

opens from it. East of the kitchen are two rooms and a porch south of the two rooms and a doorway opens from the kitchen to the porch and at the time of the alleged crime there was a screen door therein which opened outward and it was hung with a spring to keep it closed. East of the two rooms and the porch is a wood room. At the northeast corner of the wood room but not opening from it is a water closet opening to the south. From the closet to the door leading from the porch into the kitchen is sixty feet. About ninety feet east of the wood room is the defendant's barn. The first story of the barn faces the house but the basement of the barn faces the east and away from the house. There is a driveway from the road in front of the house along the south side of the house facing the kitchen porch. It was necessary in going along the east side of the wood room to the closet to walk on a board about eight inches wide and eight feet long to prevent stepping in wet muddy ground.

The complainant's story of what occurred after defendant's wife went to her school is as follows: " After the defendant's wife left I changed my dress; I don't know where the defendant was when I changed my dress; after I changed my dress I started to wash the dishes and then I went to the closet; the defendant came there while I was there; he asked if there was room for him, I said, ' no, I will get out;' then he got hold of me, caught hold of my arms and around my waist; I had on a calico waist; after he catched hold of me I tried to get away and told him to let go of me; I don't remember that he said anything; I struggled to get away in the closet and he pulled me out of the closet; he took me in the house. . . . When he grabbed me around the waist and started with me from the closet I tried to pull away from him and told him to let go; I made a noise; I screamed. . . . He took me through the kitchen and through the parlor and into the parlor bedroom; he had hold of me; he had hold of my arms; he took

me into the parlor bedroom; he took me through the kitchen and the parlor, and after we got into the parlor bedroom he threw me over backwards on the bed; I don't remember that he said anything to me then; I screamed and he told me to keep still, to shut up; he threw my clothes up and I tried to keep them down; I had my drawers on; my drawers were on me; I tried to hang on my drawers and keep my clothes down; then he got right over on to me; then I told him to get up and screamed and he told me to keep still. . . . I told him I would go home and have him arrested."

Complainant says that sexual intercourse was then accomplished by the defendant, and that she resisted the defendant with all the strength she had. She further says that her drawers were closed drawers, fastened with a button in the back; that they were taken off of her by the defendant. She says after the defendant got off of her, " I got up as quick as I could from the bed; then I found my drawers on the chair and put them on; I don't remember when they came off; I did not take them off." She further says, " I was awfully frightened."

While complainant was putting on her drawers defendant sat on the bed. They then left the room.

Complainant further says: " Next I went out into the kitchen and he asked me if I was mad and I told him ' yes,' and I should think he would be ashamed of himself; I then went out in the kitchen and he followed me; he then went out towards the barn and I went back in the sitting room and combed my hair; then I went back in the kitchen and commenced to wash the dishes; I don't know where the defendant was unless he was at the barn. I saw him after that; he came to the door and asked me if I was going to wash the milk can; I told him ' no.' (On cross-examination she said: I told him ' no ' I was not going to wash them. I told him it was because I would get my dress wet.") Nothing further was

said. When I next saw the defendant he came to the door and said he was going on the hill after the horses; he had a halter; he then went on the hill. Then I changed my dress. . . . I then started for the car; the car was going north when I reached the track.

Complainant says she took the car and went about a mile north, and stopped at a hotel and there saw the proprietor and his wife whom she had previously known, and waited for a south-bound car. She remained there fifteen or twenty minutes, and then took an open south-bound car that passed the defendant's house. When the car reached a point near the defendant's house the defendant got on the car and sat down three or four seats ahead of complainant. When the car arrived at Oneonta, a distance of several miles from defendant's the complainant went to the ticket office and the defendant followed her and each had a rebate check cashed; then they walked on the streets and stood upon the streets of Oneonta and talked for a short time. Complainant, referring to the conversation and what she subsequently did, says, " defendant asked me if I was not going back with him; I told him 'no;' he asked me if I was not coming up to-night and I told him ' no,' and he asked what Bertha would think and I told him I did not know; I would tell her when I saw her. I told him to go back and he kept on following; when I came to Maple street I told him I was going to my aunt's, and he offered to pay my fare back if I would go back; he said if I would go back he would go to the fair to-morrow; I told him ' no ' I was not going back. He followed me to the corner of Maple street. I went to my aunt's, Mrs. Bradley's. . . . I stayed there that night; that day I went down street with my aunt; in the afternoon . . . I called at her daughter's, Mrs. McCrum, my cousin. I stayed there next day until afternoon. I went down street to get a chance home; I left for home about five o'clock. I rode with Mrs. Coe; she lives about a mile below our place, and from there with Mrs. Burdick."

The alleged crime took place on Wednesday morning. Complainant arrived at her home Thursday night; and on Friday morning she told her mother and father what she claimed had occurred. She produced on the trial a calico waist in which was a tear, and she says it was torn by the defendant when he had hold of her in the closet. She also produced drawers and a wrapper showing some stains which she says resulted from a discharge occurring after the crime was committed.

A physician was called Saturday afternoon who examined complainant, and then the drawers and wrapper were first removed and for the first time they were seen by a person other than the complainant. The physician testified that her hymen had been ruptured. He says he thought she was commencing to menstruate when he made the examination, and that he did not find any irritation or discharge that he should not expect to find the day before or just preceding the menstrual period. He says he was unable to tell how long the hymen had been ruptured; that it might have been ruptured three days before or three years before, but he should say it was a recent rupture. He further says that he examined her person, thighs and legs, for marks or bruises, but did not find any, and that there was nothing to indicate recent sexual intercourse.

It was necessary for the prosecution to prove beyond a reasonable doubt that the defendant violated the person of the complainant without her consent and against her will and resistance.

It is provided by section 278 of the Penal Code as follows: A person who perpetrates an act of sexual intercourse with a female not his wife, against her will or without her consent, or . . .

" 2. When her resistance is forcibly overcome, or

" 3. When her resistance is prevented by fear of immediate and great bodily harm, which she has reasonable cause to believe will be inflicted upon her, . . . is guilty of rape in the first degree."

It is further provided by section 283 of the Penal Code that: " No conviction can be had for abduction, compulsory marriage, rape or defilement, upon the testimony of the female abducted, compelled or defiled, unsupported by other evidence."

The corroboration must extend to every material fact essential to constitute the crime. (People v. Page, 162 N. Y. 272; 14 N. Y. Crim. 513.)

The essential fact to constitute the crime for which the defendant stands convicted is that he had sexual intercourse with complainant forcibly and against her will.

Such essential fact must have some " other evidence " than that of the complainant to support it. A disclosure or statement by the complainant, which depends wholly upon her veracity, is not " other evidence " in support of her version of the affair within the meaning of the statute. (People v. Page, *supra*.)

The apparent exceptions to this rule are where the complainant makes disclosure of the assault as she hastens from the place where it occurred with torn clothing and dirt covered, dishevelled appearance, bearing unmistakable evidence of a struggle.

We do not think the people presented sufficient evidence in corroboration of the testimony of the complainant to satisfy the requirements of the statute.

The way in which the alleged assault took place repels the idea of its being seriously against the complainant's will. At the time of the alleged assault there were three men in the basement of defendant's barn. Defendant knew they were there. It is difficult to understand why he should have forcibly attacked complainant at a place where there was immediate danger of any outcry being heard at the barn, and also where he was in plain sight of the public highway, and where he was compelled to back up and drag complainant after him a distance of about sixty feet in the open before reaching a door of the house, and then

through doors and three rooms into a fourth room, where, a few minutes before or a few minutes after, he could have accomplished his purpose when complainant was in one of the rooms which he could have purposely closed to avoid exposure, and where the very suddenness of his assault would have tended to overcome much of the struggle which the complainant claims that she made against him.

The lack of any evidence in the bedroom to indicate injury or resistance; the removal of the complainant's drawers by the defendant without their being soiled or in the slightest manner injured; the fact that they were found by her after the assault on a chair in the room or on the foot of the bed; the conversations by complainant with defendant at his house after the assault, and at Oneonta; her delay in making disclosure of the alleged crime, and the entire lack of any marks or bruises on her person, all tend to show that if the defendant had sexual intercourse with the complainant her resistance was not as genuine, persistent and forceful as it should have been.

All the evidence that the prosecution claims to have presented in corroboration of the complainant's evidence is that she was at the defendant's house in the morning when the defendant's wife went to her school; that she was subsequently seen with the defendant in Oneonta; that although some of those who saw her at Oneonta and at home says she appeared naturally, yet several that saw her said that she was melancholy and sad, the physician's evidence and the fact that complainant told her parents that she had been assaulted, and that a calico waist she wore had been torn in the struggle.

This evidence, so far as it is in corroboration of the complainant's evidence, is not sufficient to sustain a conviction of rape in the first degree.

All concurred.

Judgment reversed and new trial ordered.

## CORROBORATION UNDER SECTION 283, PENAL CODE.

Consult prior notes in this series: Vol. 5, pp. 221, 251; Vol. 6, p. 178; Vol. 7, p. 120; Vol. 11, p. 193, and Vol. 16, p. 399.

The cases upon the subject of corroboration are so full of theoretical discussion that the reader finds their doctrines difficult of application to any given state of facts. In the present note, all theory has been ignored, and the writer has presented a number of cases entirely from the standpoint of the evidence. His design has been to show what "other evidence" has been held sufficient to sustain convictions. The bulk of this note was originally printed as a brief upon the argument of People v. Stefano, *infra.*

Certain cases which deal with classes of evidence are as follows:

(*Matter requiring no corroboration.*)—It has been repeatedly held that it is not necessary to corroborate the injured woman in any of the following respects: (1) As to previous chaste character; or (2) as to her being unmarried (Kenyon v. People, 26 N. Y. 203; People v. Kearney, 110 id. 188, 194; 7 N. Y. Crim. 106, 119; People v. Orr, 92 Hun, 199; 11 N. Y. Crim. 188; aff'd 149 N. Y. 616, on opin. below). Nor is it necessary to corroborate her as to (3) the very act of sexual intercourse (People v. Stott, 4 N. Y. Crim. 306, 312; aff'd 5 N. Y. Crim. 61; People v. Adams, 72 App. Div. 166; 16 N. Y. Crim. 454). The Court of Appeals has said that circumstantial evidence only can, save in rare instances, be adduced, and to require more would be to render the statute mere *brutum fulmen.* (Boyce v. People, 55 N. Y. 644.)

There is an interesting case in which the conviction was essentially for an attempt to rape, although the defendant was indicted for assault in the second degree. In that case, the opinion stated that the conviction could be sustained upon the unsupported testimony of the complainant. (People v. Kirwan, 10 N. Y. Crim. 338.)

(*Corroboration by another witness.*)—Frequently, in cases of this character, a third person is present, whose capacity as a witness is qualified because of being a child, an accomplice, or the like. There are several cases which hold that the "other evidence" given by such a second witness will suffice for corroboration, even though the testimony of the second witness would not, of itself, be sufficient to convict; for example: Where the girl's testimony was supported by that of a confederate of the defendant (People v. Powell, 4 N. Y. Crim. 585, Gen. T., 3rd Dept.) ; where. two girls were abducted together, and the testimony of the complainant was supported by that of the other abducted girl (People v. Panyko, 71 App. Div. 324; 16 N. Y. Crim. 438, aff'd 171 N. Y. 669, no opin.). By analogy, in a case of sodomy upon a young child, it was held that his testimony was sufficiently supported, under section 392, Code Crim. Proc., by that of boys younger than himself (People v. O'Brien, 74 Hun, 264; 9 N. Y. Crim. 51).

The books are full of cases of abduction or rape in the second degree in

which the girls go in couples, and in such cases the evidence is held sufficient, as a matter of course. See generally: People v. Seeley, 37 Hun, 190, 3 N. Y. Crim. 225, aff'd 101 N. Y. 642, no opin.; People v. Stott, 4 N. Y. Crim. 306, aff'd 5 id. 61; People v. Estell, 106 App. Div. 516, *infra*, p. 496.

(*Pregnancy as corroboration.*)—In two seduction cases, such evidence was received (Boyce v. People, 55 N. Y. 644; Armstrong v. People, 70 id. 38). In the later Kearney case, it was held, however, that evidence which showed the birth of the child at a date so remote that conception must have taken place after the alleged promise, was not corroborative, and was improperly admitted (People v. Kearney, *supra*). The Kearney case was followed in a like case of People v. Butler, 55 App. Div. 361; 15 N. Y. Crim. 207.

We now pass to cases in which the " other evidence " is entirely circumstantial. These cases are presented without regard to arrangement. No reference is made to the complainant's story, which, in each instance, was sufficient to establish the facts of the crime. The circumstances constituting the " other evidence " was alone given. In each instance they were held to satisfy the requirements of section 283.

(*Seduction.*)—The " other evidence " showed that the complainant " was alone with the prisoner at the time she charged the offence was committed, also as to her condition and appearance after it, as to his attentions and familiarities, and as to his solicitude during her sickness immediately following the alleged offence." *Held:* Sufficient and " to require more would be to render the statute mere *brutum fulmen.*" (Boyce v. People, 55 N. Y. 644.)

(*Seduction.*)—The " other evidence " in the later Armstrong case is not clearly stated in the opinion, but seems to be of the same character as the supporting testimony in the Boyce case, *supra*. The Boyce case was followed as authority. (Armstrong v. People, 70 N. Y. 38.)

(*Rape.*)—Ample proof of opportunity and intention, and evidence of physician who " found injuries upon her person which such an act might have occasioned." *Held:* " There was, therefore, positive proof of the highest character and corroboration of the witness." (People v. Crowley, 102 N. Y. 234, 4 N. Y. Crim. 168.)

(*Assault with intent to rape.*)—Testimony by the child's mother and by a physician who, upon the next day, found an abrasion on the labia; also explanations of an incredible character made by the defendant. *Held:* Sufficient. (People v. Cullen, 5 N. Y. Supp. 886.)

(*Rape in the second degree.*)—It appeared that the defendant was charged with the crime and made no denial, but was overcome by agitation, and, when asked by his wife to say whether it was so, nodded his head affirmatively. *Held:* Sufficient corroboration. (People v. Morris, 12 N. Y. Supp. 492.)

(*Rape.*)—It appeared by other evidence that the woman's clothing, etc., was covered with dirt and mud; that she told the police officer that one of her three assailants had lost his hat, and the officer saw, upon the opposite side of the street, three men, one of whom (the appellant) had no hat on, and who started to run as soon as he saw the officer, but stopped upon the officer's threat to shoot. He was then taken into the complainant's presence and identified. His knees were wet and muddy, and he made false statements as to others having been with him and as to the disappearance of his hat. *Held:* Sufficient corroboration. (People v. McGuinness, 15 N. Y. Supp. 230.)

(*Abduction.*)—The girl was corroborated as to the taking, etc.; as to her age, etc.; also by defendant's testimony, which showed that the house was one of prostitution, although the defendant claimed that she did not know what the men and women did whom she allowed to go upstairs, and that she did not know whether the girl had connection with anybody. *Held:* Sufficient corroboration. (People v. Brandt, 14 St. Rep. 419, aff'd 110 N. Y. 657, no opin.)

(*Rape.*)—The supporting testimony was, that defendant was seen going to and away from the house of the complainant, where she was alone, at about the time at which the crime was committed; also by one witness of immediate complaint upon her part, and an appearance of tears and distress corresponding with her story of the wrong to which she had been subjected. *Held:* Slight, but sufficient to go to the jury; new trial granted, however, for the admission of other incompetent evidence. (People v. McKeon, 64 Hun, 504, 10 N. Y. Crim. 205.)

(*Rape.*)—It appeared by the " other evidence " that disclosure had been made by the girl to her father and mother at the first reasonable opportunity; moreover, the girl had been in such a situation with the defendant that he had an opportunity to commit the crime; they were in a carriage which, as was shown by the wagon tracks next day, was driven off the highway into a piece of woods. Moreover, a button, torn off the girl's drawers in the assault, was found about eight days afterwards in the woods at the place where she said the assault had been committed. There was, in addition, the circumstance of the girl's appearance the same day, hair ruffled up, dirt in her shoes, downhearted and wiping her eyes; moreover, the physician's examination the next day found a recent rupture of the hymen. *Held:* " In this case there was sufficient corroborative or supporting evidence." (People v. Terwilliger, 74 Hun, 310, 9 N. Y. Crim. 73; affirmed, 142 N. Y. 629, on opin. below.)

(*Seduction.*)—The " other evidence " was a physician's examination, showing laceration of the mucous membrane of the vagina, bleeding, etc.; also that the defendant subsequently had a conversation with Dr. McK.,

who examined the girl and told defendant she was "about four and a half months' along," to which defendant said, "That leaves me in a pretty fix. I would like to get help out of it;" also conversations between the defendant and Dr. McK. in which the defendant sought to induce the doctor to perform an abortion on the girl. *Held:* "The evidence of corroboration was sufficient." (People v. Orr, 92 Hun, 199, 11 N. Y. Crim. 188; affirmed, 149 N. Y. 616, on opin. below.)

(*Rape in the second degree.*)—The girl was the defendant's stepdaughter. About two weeks before the trial, her mother testified that she found them together in a room with the door locked, and that the defendant looked frightened. She asked him where the girl was. He said in the bedroom, and the mother found her there acting suspiciously. The defendant also made an inaccurate statement, but denied that he had been doing anything to the child. About ten days before the crime, the girl's sister testified that the defendant told her to take the two other children and get them some candy; that she left the defendant and the girl together, and that when she came back shortly afterwards, she found the door locked, and the defendant came and opened it. There was also evidence that the defendant had acted indecently with the girl in the presence of other children. The mother also produced a letter written by the defendant, in which he said: "I have fooled with her, but have never harmed her. If a doctor examined her it would be found that she is not wronged." In the police court, when the defendant was charged with the crime, he also said: "I may have fooled with her, but I never did her any harm." The defendant tried to explain "fooling with" as meaning that he only had fun with the girl, wrestling with her, throwing her on the floor, etc., etc. There was also testimony that the girl never went with other men or boys; also of a physical examination by a physician. *Held:* That the "other evidence" was of such a nature as to leave no doubt that the girl's story was substantially true. (People v. Grauer, 12 App. Div. 464.)

(*Rape.*)—There was a disclosure by the girl to her mother about a week after the crime; also a physical examination, which showed complete penetration. The girl's drawers were torn and had blood on them. There was also testimony by another girl named Berkowitz, who had been with the complainant. The Berkowitz girl testified to going with the complainant into the basement of 17 Baxter street, with one Pelligrini. There they met the defendant Adams and two others, called "Buck" and "Banjo." Pelligrini left. Adams made indecent proposals, which complainant resisted. He called Buck and Banjo to help him, whereupon the Berkowitz girl became frightened and ran out on the street. On the street she subsequently heard the complainant scream. When the complainant came out she asked her what they had been doing to her downstairs, and the complainant replied, "Oh, nothing." The Berkowitz girl

identified the defendant as having been present in the basement. An S. P. C. C. officer also swore that defendant admitted that he was present in the basement, and that he saw Buck and Banjo have connection with the girl in his presence; but that he himself did not have connection with her. The defendant denied everything. *Held:* "The corroboration was complete, both as to direct testimony and circumstances." (People v. Adams, 72 App. Div. 166; 16 N. Y. Crim. 454.)

(*Rape in the second degree.*)—The girl's father found the defendant in the room where the girl was in bed. He was looking at the clock, and said that he came in to see the time. In addition, the child disclosed the rape to the woman with whom she lived, shortly after the act. The defendant admitted that he was in the room with the girl; said he was drunk, and admitted that he had committed an act of sodomy upon the girl. He subsequently, however, denied making these admissions. Upon his cross-examination, he made three wholly different explanations of his presence in the girl's room. *Held:* "Judgment affirmed. No opinion." (People v. Stefano, 96 App. Div. 626.)

(*Rape in the second degree.*)—A witness testified that the cellar in which the assault was committed was occupied by the defendant. Upon the morning after, while the child's mother was dressing her, she noticed blood on the child's drawers. The child thereupon told the story of the assault. That afternoon, the mother took the child to a doctor, who made an examination and found the child's parts were lacerated and inflamed, and testified that the injuries appeared to have been made within a day or so. *Held:* "Judgment affirmed. No opinion." (People v. Restiano, 107 App. Div. 616.)

(*Rape in the first degree.*)—The girl was only 9 years old. The act was performed upon the roof of a tenement house. The defendant, after committing the act, left the roof and went downstairs. The girl's mother subsequently went to the roof, being called there by the girl's little brother. She examined the girl's clothes, and found them covered with blood. The father subsequently came to the roof and also saw the bloody clothes. Both the father and mother testified that they went down to the defendant's room and charged him with assaulting the child, to which the defendant replied, "Keep quiet. Keep silent. I pay you for that," or, "Well, I did it; but keep quiet. I'll pay for it," or words to that effect. There was unsatisfactory evidence by a physician, who examined the child the same day. He testified to the laceration, etc., of the child's private parts, but stated that the conditions that he found indicated that penetration had occurred about two weeks before. The defendant took the stand; denied his guilt, and told an incredible story that, a week or ten days before, he had observed improper relations between the little girl and her older brother; had watched to see them repeat it, and had failed to inform the parents, with whom he had lived for nearly a year on terms of friendship.

*Held:* That the jury might have found that the physician was mistaken; also held that "The corroboration was complete. The parents saw the evidences of the recent assault by someone. The child accused the defendant. He was there and had the opportunity, and, when confronted, he admitted it." The court also adverted to the highly improbable story of the improper relations between the girl and her brother. (People v. Biglizen, 112 App. Div. 225, affirmed, 185 N. Y. 616, no opin.)

(*Abduction.*)—The girl testified that the defendant, on a prior occasion, took her to Central Park and had intercourse with her. This was not corroborated. Subsequently, on the day charged in the indictment, she went with him again, at his suggestion, to the park, it being his intent to have sexual intercourse with her. The "other evidence" was as follows: The police officer, who had kept them under observation, testified that he saw them enter the park; that he subsequently saw them first standing in one of the summer houses; and that he then saw them sitting on a bench embracing and kissing one another; that they then moved to another bench, where she again sat on his lap, whereupon the policeman went up and asked him if he was any relation of the girl, and he falsely said he was her brother. (See Case on Appeal.) *Held:* Even though the "taking" was not corroborated, "it is clear under her evidence, which is amply corroborated, that the defendant *received* her there for the prohibited purpose." People v. Smith, 114 App. Div. 513; appeal dismissed, — N. Y. —, February 1, 1907.)

In two or three of the cases last cited, it will be observed that the affirmance was without opinion, or that the case on appeal was referred to to supply matters which were not adverted to in the opinion. The writer is, however, familiar with the facts in each case, inasmuch as he either conducted the appeals himself, or was familiar with the records.